# EXHIBIT 1

# STATE OF NORTH CAROLINA

**MECKLENBURG** County

File No.
23-CVS- 4537

In The General Court Of Justice
☐ District ☒ Superior Court Division

*Name of Plaintiff(s)*
SHOW PROS ENTERTAINMENT SERVICES OF CHARLOTTE, INC.

*Address*
c/o Sara R. Lincoln and R. Jeremy Sugg
Lincoln Derr PLLC
4350 Congress St., Suite 575

*City, State, Zip*
Charlotte, NC 28209

**VERSUS**

*Name of Defendant(s)*
PANTHERS STADIUM, LLC

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

*G.S. 1A-1, Rules 3 and 4*

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) issued*

### To Each Of The Defendant(s) Named Below

*Name And Address Of Defendant 1*
PANTHERS STADIUM , LLC
c/o David Vaught, Registered Agent
800 Mint Street
Charlotte, NC 28202-1518

*Name And Address Of Defendant 2*

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out!**
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!
**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.**
**¡NO TIRE estos papeles!**
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*Name And Address Of Plaintiff's Attorney (If none, Address Of Plaintiff)*
Sara R. Lincoln and R. Jeremy Sugg
Lincoln Derr PLLC
4350 Congress Street; Suite 575
Charlotte, North Carolina 28209

*Date Issued* 3·9·23

*Time* 9:30 ☒AM ☐ PM

*Signature*

☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk of Superior Court

☐ ENDORSEMENT (ASSESS FEE)
This summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this summons must be served is extended sixty (60) days.

*Date Of Endorsement*

*Time* ☐AM ☐ PM

*Signature*

☐ Deputy CSC    ☐ Assistant CSC    ☐ Clerk of Superior Court

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

| | RETURN OF SERVICE | |
|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served ☐AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served ☐AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100 Side Two, Rev. 04/18
© 2018 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23-CVS-4537

MECKLENBURG CO., C.S.C.

SHOW PROS ENTERTAINMENT
SERVICES OF CHARLOTTE,
INC.,

                    Plaintiff,

v.

PANTHERS STADIUM, LLC,

                    Defendants.

**COMPLAINT**

Plaintiff **SHOW PROS ENTERTAINMENT SERVICES OF CHARLOTTE, INC.** ("Plaintiff" or "Pros") complaining of Defendant **PANTHERS STADIUM, LLC** ("Defendant" or "PSLLC") alleges as follows:

## THE PARTIES AND JURISDICTION

1.      Plaintiff is a North Carolina corporation, formed and existing under the laws of the State of North Carolina. Plaintiff's principal place of business is in Charlotte, Mecklenburg County, North Carolina.

2.      Defendant is a North Carolina limited liability company, formed and existing under the laws of the State of North Carolina. Defendant controls and operates, pursuant to a ground lease, that certain piece of real estate and accompanying structure located at 321 South Cedar Street, Charlotte, Mecklenburg County, North Carolina, 28202 (PID #07328101B) and more commonly known as "Bank of America Stadium" (hereinafter "the Stadium").

3.      This matter arises out of a contract between Plaintiff and Defendant, a breach of the contract by Defendant, and related claims. The contract at issue was entered into in North Carolina and provides that it is to be construed in accordance with the laws of North Carolina. The events described herein occurred in Charlotte, North Carolina.

4.      This Court has jurisdiction over the subject matter in this Complaint.

5. This Court has personal jurisdiction over Defendant.

6. Mecklenburg County is the proper venue for this matter.

## FACTUAL ALLEGATIONS

7. Plaintiff provides event staffing and related services for events and facilities in the Southeastern United States, including sports and entertainment facilities and events.

8. Defendant controls and operates the Stadium where sports and entertainment events are held, including professional football and soccer games, and concerts.

### The 2010 Agreement

9. On June 1, 2010, Plaintiff and Defendant entered an Agreement to Provide Event Staffing ("the 2010 Agreement"). A copy of the 2010 Agreement is attached as **Exhibit A** and incorporated herein by reference.

10. Pursuant to the 2010 Agreement Plaintiff agreed to provide event staffing services ("the Services") for all Carolina Panthers football games played at the Stadium throughout the term of the 2010 Agreement, along with other events at the request of Defendant.

11. In exchange for Plaintiff's provision of the Services, Defendant agreed to pay Plaintiff based on rates established in the 2010 Agreement ("the 2010 Rates").

12. The 2010 Agreement provided for a term of three years from June 1, 2010 to May 31, 2013 ("the 2010 Term"), plus two consecutive one-year options ("the 2010 Option Period").

13. The 2010 Agreement further provided: "PSLLC shall have the right to terminate this Agreement if the personnel provided and services rendered by Pros are not, in the sole opinion of PSLLC, up to the standards Pros and PSLLC have agreed are necessary and which Pros represent they can furnish." (Hereinafter "the Agreed Necessary Standards").

14. Plaintiff and Defendant operated pursuant to the 2010 Agreement throughout the 2010 Term and the 2010 Option Period.

15. Following the expiration of the 2010 Option Period, Plaintiff and Defendant did not execute a new agreement, but continued to operate pursuant to the terms of the 2010 Agreement.

2

## Plaintiff's QATT Application

16. In 2017, Plaintiff began an application process for approval as a Qualified Anti-Terrorism Technology (QATT) by the Department of Homeland Security (DHS) pursuant to the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 ("the SAFETY Act").

17. The SAFETY Act provides certain legal liability protections for claims arising out of acts of terrorism where a QATT is used. Crowd management and security services such as those provided by Plaintiff can qualify as a QATT if approved by DHS.

18. Plaintiff began the QATT application process on its own, and not pursuant to any request, recommendation, or requirement on the part of Defendant.

19. Plaintiff hired a law firm specialized in regulatory and government affairs ("Plaintiff's Regulatory Counsel") to assist Plaintiff in the application process.

20. Plaintiff's Regulatory Counsel has continued working on Plaintiff's certification since 2017.

21. Soon after Plaintiff began the QATT application process, a representative of Plaintiff informed a representative of Defendant that Plaintiff was pursuing QATT approval.

22. Due in part to a mass shooting in Las Vegas in 2017, DHS' standards for security service providers to qualify as QATTs increased.

23. Plaintiff's Regulatory Counsel has continued to prepare information and materials in support of Plaintiff's QATT application to meet DHS' evolving standards.

## The 2019 Agreement

24. Following the 2018 NFL season, Defendant asked Plaintiff to prepare a new four-year contract.

25. Plaintiff prepared a proposed contract and sent it to Defendant for review and comments on or about June 21, 2019.

26. On June 23, 2019, Defendant's Director of Security Stadium Operations, Eddie Levins ("Levins") responded and advised that Defendant required no revisions to the draft agreement and Plaintiff's authorized representative could sign on July 1, 2019.

3

27.     On July 1, 2019, Defendant's President, Todd Stewart ("Stewart"), signed the new Agreement to Provide Event Staffing ("the 2019 Agreement") and emailed the signed copy to Levins. A copy of the 2019 Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

28.     Levins responded on the same date and indicated he would provide Stewart a copy signed by Defendant's Chief Operating Officer, Mark Hart ("Hart"), "asap."

29.     The 2019 Agreement was identical to the 2010 Agreement with the following exceptions:

     a.     The 2019 Agreement provided for a four-year term from June 1, 2019 to May 31, 2023 ("the 2019 Term");

     b.     The 2019 Agreement provided for three consecutive one-year renewal options; and

     c.     The 2019 Agreement provided for updated rates of pay for the services to be provided by Plaintiff ("the 2019 Rates").

30.     The 2019 Agreement did not require Plaintiff to seek out or obtain QATT approval in any way.

31.     The parties did not agree, pursuant to the 2019 Agreement or otherwise, that the Agreed Necessary Standards included QATT approval or any level of achievement in the QATT application process.

32.     The parties did not agree, pursuant to the 2019 Agreement or otherwise, that the Agreed Necessary Standards required that Plaintiff ensure the status of Plaintiff's QATT application would not compromise any efforts by Defendant to pursue QATT approval.

33.     The Agreed Necessary Standards apply only to personnel provided and services rendered by Pros.

34.     Obtaining QATT approval is not a service that was, or was to be, rendered by Pros.

35.     The 2019 Agreement did not condition Defendant's performance in any way on Plaintiff seeking out or obtaining QATT approval.

4

36.     Defendant never provided Plaintiff a signed copy of the 2019 Agreement; however, the parties operated pursuant to the terms of the 2019 Agreement from July 1, 2019 to July 1, 2020.

37.     Specifically, and without limitation, Defendant paid Plaintiff pursuant to the 2019 Rates and not the 2010 Rates.

### Defendant's Breaches

38.     By letter dated June 1, 2020, Hart informed Plaintiff that Defendant had "concerns" related to Defendant's QATT application.

39.     Hart further advised Defendant began its own QATT application in 2018 and this required Defendant "to seek out and utilize" QATT technologies and services. Hart indicated that Defendant was recently informed that Plaintiff was "no longer seeking certification."

40.     Hart took the position that Defendant was not "under any agreement" with Plaintiff because the 2019 Agreement was never "fully executed[.]" Nonetheless, Hart indicated that Defendant wanted "to give ShowPros the same opportunity to remedy the situation."

41.     Accordingly, Hart advised: "Unless ShowPros is in *[sic]* position to verify in the next thirty (30) days that its application for Safety Act certification is in order and will not compromise the Panthers' timeline for its Safety Act application, we plan to terminate our relationship with ShowPros for provision of services at Bank of America Stadium effective thirty (30) days from the date of this letter."

42.     Upon information and belief, on June 1, 2020, Defendant had no intentions of (a) permitting Plaintiff an opportunity to confirm the status of its QATT application, or (b) continuing to abide by the terms of the 2019 Agreement.

43.     Upon information and belief, by at least early June 2020, Defendant had already reached an agreement with a new provider of event staffing services: WESS Event Services, a GardaWorld Company, a/k/a Whelan Event Services a/k/a BEST Crowd Management ("WESS").

44.     Upon information and belief, as early as June 12, 2020, WESS posted employment applications for event security positions at the Stadium.

45.     Upon information and belief, in June 2020 and through February 16, 2023, WESS was not a QATT for the provision of crowd management or security services such as those provided pursuant to the 2010 Agreement and 2019 Agreement.

5

46.     By letter dated June 16, 2020, Plaintiff's Regulatory Counsel provided confirmation of the status of Plaintiff's QATT application. Plaintiff's Regulatory Counsel confirmed that while the process was "arduous and gradual" it was "well into" its efforts in preparing Plaintiff's application and supporting documents.

47.     On June 18, 2020, Stewart emailed Hart to confirm the letter from Plaintiff's Regulatory Counsel clarified the status of Plaintiff's QATT application and further confirm Plaintiff's commitment to providing the highest level of services at the Stadium. Stewart noted that he nor Plaintiff's long-time Account Manager for the Stadium, Tim Roberts ("Roberts"), had previously been informed of any concerns related to Plaintiff's provision of services at the Stadium.

48.     Upon information and belief, Defendant required, or at least encouraged, WESS to hire Roberts away from Plaintiff as part of Defendant's negotiations with WESS.

49.     From approximately March 2013 to July 2020, Roberts was Plaintiff's Account Manager for the Stadium. In this role, Roberts managed the event staffing team at the Stadium during all events. Roberts also served as Plaintiff's primary point of contact for Defendant and became intimately familiar with Defendant's operations and event-staffing needs.

50.     The experience and knowledge Roberts gained through his employment with Plaintiff provided a substantial benefit to Plaintiff in its provision of services to Defendant. Likewise, Roberts' experience and knowledge was a substantial benefit available to Defendant through Plaintiff's provision of services pursuant to the terms of the 2010 Agreement and 2019 Agreement.

51.     On July 2, 2020, Roberts resigned from his position with Plaintiff. This was only one day after the expiration of Defendant's purported thirty-day cure period.

52.     On July 3, 2020, Stewart informed representatives of Defendant of Roberts' resignation. In a response email, Levins wrote: "With the contract ending July 1, we need to discuss the way you can/want to retrieve Show Pro[s] property from the" office at the Stadium. Upon information and belief, "the contract" to which Levins was referring was the 2019 Agreement pursuant to which the parties were operating through July 1, 2020.

53.     By letter dated July 20, 2020, Plaintiff informed Defendant it was in breach of the 2019 Agreement.

6

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

54.     The preceding allegations are referred to and incorporated herein by reference.

55.     The 2019 Agreement was a valid and enforceable contract pursuant to which Plaintiff and Defendant mutually assented to be bound by its terms.

56.     The parties' mutual assent to be bound by the 2019 Agreement was expressed by their words and conduct, including, but not limited to:

  a.  Defendant's request that Plaintiff prepare a four-year contract and Plaintiff's preparation and submission of the same in response to Defendant's request;

  b.  Defendant's Director of Security Stadium Operations' indication that (i) no revisions were required to the agreement drafted by Plaintiff in response to Defendant's request that Plaintiff draft the agreement, and (ii) Plaintiff could execute the agreement as drafted;

  c.  Plaintiff's signing of the agreement and submission of the same to Defendant;

  d.  Defendant's Director of Security Stadium Operations' indication that a fully executed copy of the agreement would be provided to Plaintiff "asap";

  e.  The parties' compliance with the terms of the 2019 Agreement for approximately one year, including, but not limited to, payment for the Services at the 2019 Rates; and

  f.  Defendants' Director of Security Stadium Operations' acknowledgment of "the contract" on July 3, 2020.

57.     Pursuant to the terms of the 2019 Agreement, Defendant was required to pay Plaintiff at the 2019 Rates for the Services through and including May 31, 2023.

58.     The 2019 Agreement did not condition Defendant's performance in any way on Plaintiff seeking out or obtaining QATT approval.

59.     On June 1, 2020, Defendant breached the 2019 Agreement by, among other things:

7

a. Suggesting Plaintiff had failed to comply with a term that was not included in the 2019 Agreement, or otherwise agreed upon by the parties, and thereby repudiating the contract by attempting to inject a new term into the same;

b. Indicating Defendant would not continue to abide by the terms of the 2019 Agreement unless Plaintiff could satisfy a newly created and vague and ambiguous requirement pursuant to which Plaintiff had to satisfy Defendant that the status of Plaintiff's QATT application "would not compromise" Defendant's application, and thereby repudiating the contract by conditioning Defendant's continued adherence thereto on Plaintiff's ability to comply with a term to which the parties never agreed; and

c. Failing to otherwise conduct itself in accordance with the implied covenant of good faith and fair dealing by, among other things, (i) engaging in subterfuge as to the reasons for Defendant's threatened termination of the contract, and (ii) surreptitiously arranging for Plaintiff's long-time employee to leave his employment with Plaintiff to work for the new company with whom Defendant was already negotiating and/or contracting.

60.     On July 3, 2020, Defendant further breached the 2019 Agreement by, among other things, expressing, by its words and conduct, a positive, distinct, unequivocal and absolute refusal to perform under the terms of the 2019 Agreement, and thereby repudiating its entire remaining obligations under the 2019 Agreement.

61.     At all times relevant, including, but not limited to, the time of Defendant's repudiation on July 3, 2020, Plaintiff was ready, willing and able to perform its obligations under the 2019 Agreement and would have continued doing so but for Defendant's repudiation.

62.     Prior to July 3, 2020, Plaintiff had performed all its obligations under the 2019 Agreement and there were no material breaches or other conditions that would permit Defendant to suspend its performance or terminate the contract.

63.     As a result of Defendant's breaches described herein, Plaintiff has been damaged in an amount that exceeds $25,000.00 and is to be further determined at trial. Without limitation, Plaintiff's damages include all profits that would have been generated pursuant to the 2019 Agreement for the remainder of the 2019 Term.

8

WHEREFORE, Plaintiff prays for the following relief:

1. That all issues of fact be determined by a jury;

2. That Plaintiff be awarded all damages proximately flowing from Defendants' breaches, including, but not limited to, all profits that would have been generated pursuant to the 2019 Agreement for the remainder of the 2019 Term;

3. That Plaintiff be awarded all costs; and

4. For such other and further relief as the Court may deem just and proper.

**THIS** 27th day of February, 2023.

Sara R. Lincoln, N.C. State Bar # 22744
R. Jeremy Sugg, N.C. State Bar # 40351
Lincoln Derr PLLC
4350 Congress Street, Suite 575
Charlotte, North Carolina 28209
Telephone: (704) 496-4500
Facsimile: (866) 393-6043
Email: sara.lincoln@lincolnderr.com
Email: jeremy.sugg@lincolnderr.com

*Attorneys for Plaintiff*

9

# EXHIBIT A

## AGREEMENT TO PROVIDE EVENT STAFFING

THIS AGREEMENT made and entered into as of June 1, 2010, by and between Show Pros Entertainment Services of Charlotte, Inc., Charlotte, North Carolina (hereinafter "Pros") and Panthers Stadium, LLC, Charlotte, North Carolina, (hereinafter referred to as "PSLLC").

### Recitals

PSLLC owns and operates Bank of America Stadium (the "Stadium") in Charlotte, North Carolina, in which the Carolina Panthers will play their home football games. PSLLC desires to provide a first class, pleasurable experience for their fans, which includes every aspect of the operation of the stadium. Pros has represented that it can provide ticket takers, ushers, security personnel and supervisors for Panthers games and other events and that all such personnel will be fully trained and instructed. The training and supervision by Pros of its employees will ensure that the employees perform to the highest standards both in appearance and demeanor.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Pros and PSLLC have agreed as follows:

1.     **Term and Termination**. The term of this agreement shall begin on June 1, 2010, and continue through May 31, 2013. PSLLC shall have the right to terminate this Agreement if the personnel provided and services rendered by Pros are not, in the sole opinion of PSLLC, up to the standards Pros and PSLLC have agreed are necessary and which Pros represent they can furnish. If PSLLC elects to terminate under this provision, PSLLC will provide written notice of the deficiencies and Pros will have through the next succeeding Panthers game or other scheduled event to correct such deficiencies to PSLLC'S satisfaction. If, in PSLLC'S judgment, said deficiencies have not been corrected, this Agreement may be terminated immediately.

2.     **Option to Renew**. PSLLC shall have the right to renew this Agreement for two (2) consecutive terms of one (1) year each on the same terms and conditions by giving Pros written notice of intent to renew prior to February 1 of each contract year.

showpros 2010.docx   6/9/10

3.    <u>Scope of Services</u>.

  a. Pros shall provide event staffing for all pre-season, regular season and post-season Panthers football games played at the Stadium during the term of this agreement with the exception of a Super Bowl should the National Football League assume responsibility for event staffing. Pros shall also provide event staffing for other non-NFL events at the request of PSLLC. These services shall include, but not be limited to, hiring, training and supervising ushers, security employees, event coordinators and miscellaneous personnel as required by PSLLC.

  b. Staffing requirements may vary from game to game or event to event depending on the anticipated attendance. The number of personnel for each game or event will be determined by PSLLC and communicated to Pros at least four (4) days prior to each game or event.

  c. All Pros' employees will be classified as either Event Staff, Captains or Supervisors. PSLLC will pay to Pros the following hourly rates for employees furnished for stadium events:

<u>June 1, 2010 through May 31, 2011 rates</u>

| | |
|---|---|
| Event Staff | $14.80 |
| Captains/Supervisors | $19.40 |
| Event Manager | $309/Event |

Overnight staff will be charged at $3 premium per hour to work a third shift.

Holiday rates of 1 ½ times the rates stated above will apply on these days:

| | |
|---|---|
| New Years Day | Labor Day |
| Martin Luther King Day | Thanksgiving Day |
| Easter | Christmas Eve after 5:00 p.m. |
| Memorial Day | Christmas Day |
| July 4 | New Year's Eve after 5:00 p.m. |

<u>June 1, 2010 through Option Years</u>

  All rates will be adjusted to reflect any changes in the Southeast Consumer Price Index Card during the previous year.

showpros 2010.docx  6/9/10      2

The number of hours, not less than four (4), to be worked for each event shall be established by PSLLC not less than four (4) days prior to each event. PSLLC shall be entitled to audit the payroll records of Pros for any event in order to verify the amount being billed and the hourly rate paid to staff, including the time and a half holiday pay.

        d.    Pros will provide all equipment necessary for the performance of its duties hereunder including uniforms, two-way radios and other communications equipment, and personnel necessary for stadium control. If requested by PSLLC, some uniforms will be embroidered, at PSLLC'S cost, with the Bank of America logo or name. All security personnel provided by Pros will be registered as required by law and will carry or wear appropriate identification. The number and type of radios provided shall be acceptable to PSLLC.

        4.    **Payment for Services Rendered**. Pros shall submit to PSLLC invoices for services rendered within seventy-two (72) hours after the game or event or as soon thereafter as is practical. Invoices will be paid by PSLLC within fifteen (15) days of receipt.

        5.    **Training**. Pros shall develop written job descriptions and comprehensive training programs for each Pros employee assigned to Stadium events. The training will emphasize customer service, crowd management, security, and all Stadium emergency procedures. Participation in training sessions will be mandatory for each Pros employee. Pros will maintain an information base on its employees to include training records. All Pros training materials will be submitted to PSLLC for approval to ensure that they are consistent with and clearly set forth PSLLC'S expectations. The hiring and training programs will be conducted in such a manner that the appearance and demeanor of Pros employees will be totally acceptable to PSLLC. Pros employee handbooks will be written by Pros and submitted to PSLLC for approval. Handbooks will be provided to each Pros employee and shall include policies and procedures for all event staff personnel, including PSLLC'S emergency and evacuation procedures. Each Pros employee shall acknowledge in writing that he has read and understands event security plans and emergency procedures. Pros employees' appearance and performance should be such that patrons of the Stadium feel they have been provided superior service by courteous, well-trained employees. All Pros staff must pass a written test, as developed by PSLLC and Pros, prior to being deployed for a Stadium Event.

showpros 2010.docx  6/9/10                  3

6. **Reports.** Within seventy-two (72) hours after each game or event, Pros will furnish to PSLLC a complete report of all activities and incidents relative to staff operations for each game or event. Said reports shall include the names, addresses and other information such as PSL or seat locations of all persons arrested or ejected from the stadium, the names of the arresting or ejecting officers, and all information pertaining to incidents handled by security and/or other event staff personnel. Reports that relate to injuries will also be included and should contain all pertinent information such as name and address of injured party as well as a complete description of the injury, the cause of the injury, and treatment.

7. **Office Space, Assembly/Storage Room.** PSLLC will provide such office space and assembly/storage areas which, in its sole opinion, are adequate for Pros, free of charge for the term of this agreement.

8. **Parking.** PSLLC will arrange for parking and shuttle service (if necessary) for Pros employees. Pros will reimburse PSLLC for the reasonable costs related thereto, which will be $6.00 per space per Event for the first year of the Term.

9. **Indemnification, Insurance and Waiver of Subrogation.**

**Indemnification.** To the fullest extent permitted by law, Pros shall indemnify and hold harmless PSLLC, Panthers Football, LLC, and their respective officers, directors, partners, employees and agents from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of services, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of Pros, anyone directly or indirectly employed by Pros, or anyone for whose acts Pros may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

**Insurance.** Pros shall obtain and maintain in full force an insurance policy that covers persons and property during the performance of Pros' services at the Stadium. Each policy shall name PSLLC and Panthers Football, LLC as additional insureds. Such policies shall be issued through insurance companies reasonably acceptable to PSLLC and shall not be

showpros 2010.docx  6/9/10                                         4

cancelable without sixty (60) days prior written notice to PSLLC. The provisions of said policies shall protect Pros from claims set forth below which may arise out of Pros operations under this Agreement and for which Pros may be legally liable, whether such operations be by Pros, or anyone for whose acts Pros may be liable:

    a.    Claims under workers' compensation, disability benefit and other similar employee benefits acts.

    b.    Claims for damages because of bodily injury, occupational sickness or disease or death of Pros employees. The Employer's Liability limit shall not be less than $500,000/500,000/500,000.

    c.    Claims for damages because of bodily injury, sickness or disease, or death of any person other than an employee of Pros.

    d.    Claims for damages insured by usual personal injury liability coverage which are sustained (i) by a person as a result of an offense directly or indirectly related to employment of such person by Pros, or (ii) by another person. Personal Injury Liability must include coverage for false arrest, detention or imprisonment, malicious prosecution, libel, slander, defamation of character or violation of right of privacy.

    e.    Claims for damages because of injury to or destruction of tangible property, including loss or use resulting therefrom.

    f.    Claims involving contractual liability insurance applicable to Pros' obligation under this Paragraph 9.

Insurance written to respond to the coverage requirements of parts c. through f. of this paragraph must be written on an occurrence basis policy and shall not be less than $3,000,000 per occurrence. This limit of liability may be written on a single policy or a combination of policies (i.e., primary liability and excess liability).

    g.    Claims for damages because of bodily injury, death of a person or property damages arising out of ownership, maintenance or use of a motor vehicle. The automobile liability limit shall not be less than $2,000,000 per occurrence.

Certificates of Insurance acceptable to PSLLC shall be filed with PSLLC on or before June 1 each year. In the event that any insurance purchased by Pros as required by this Agreement has a policy renewal date prior to the termination of this Agreement, Pros shall deliver to PSLLC a renewal Certificate of Insurance for the subsequent policy term not less than 14 days prior to the policy expiration date.

     <u>Waiver of Subrogation</u>. PSLLC and Pros waive all rights of subrogation against each other and any of their employees for any injuries or damages to the extent covered by insurance obtained pursuant to paragraph 9. The policies shall provide such waiver of subrogation by endorsement or otherwise. Specifically, the Worker's Compensation policy must contain a waiver of subrogation endorsement in favor of PSLLC.

10.   <u>Compliance with Laws and Regulations</u>. Pros shall at all times comply with all state and federal regulations with regard to their employment practices and their employees. Pros employees will be expected to comply with all state and federal laws and PSLLC policies while providing services to PSLLC. PSLLC reserves the right to remove any Pros employee engaging in any unlawful act or any act prohibited by PSLLC policy from their assignment at the Stadium.

11.   <u>Independent Contractor Status</u>. Pros is an independent contractor, and nothing contained herein or in the relationship between Pros and PSLLC shall be deemed to create any partnership or any relationship of employer and employee.

12.   <u>Non-Assignability</u>. Pros may not assign this Agreement without the prior written consent of PSLLC.

13.   <u>Binding Nature of Agreement</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

14.   <u>Governing Law</u>. This Agreement shall be construed in accordance with the laws of the State of North Carolina.

Case 3:23-cv-00212-MOC-SCR   Document 1-1   Filed 04/13/23   Page 19 of 28

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

SHOW PROS ENTERTAINMENT SERVICES
OF CHARLOTTE, INC.

by: _____

Name: _TODD F. STEWART_

Title: _President_

PANTHERS STADIUM, LLC

by: _____

Daniel B. Morrison, Jr.
President

showpros 2010.docx  6/9/10                                          7

# EXHIBIT B

# AGREEMENT TO PROVIDE EVENT STAFFING

THIS AGREEMENT made and entered into as of June 1, 2019 by and between Show Pros Entertainment Services of Charlotte, Inc., Charlotte, North Carolina (hereinafter "Pros") and Panthers Stadium, LLC, Charlotte, North Carolina, (hereinafter referred to as "PSLLC").

## Recitals

PSLLC owns and operates Bank of America Stadium (the "Stadium") in Charlotte, North Carolina, in which the Carolina Panthers will play their home football games. PSLLC desires to provide a first class, pleasurable experience for their fans, which includes every aspect of the operation of the stadium. Pros has represented that it can provide ticket takers, ushers, security personnel and supervisors for Panthers games and other events and that all such personnel will be fully trained and instructed. The training and supervision by Pros of its employees will ensure that the employees perform to the highest standards both in appearance and demeanor.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Pros and PSLLC have agreed as follows:

1. **Term and Termination**. The term of this agreement shall begin on June 1, 2019 and continue through May 31, 2023. PSLLC shall have the right to terminate the agreement if the personnel provided and services rendered by Pros are not, in the sole opinion of PSLLC, up to the standards Pros and PSLLC have agreed are necessary and which Pros represent they can furnish. If PSLLC elects to terminate under this provision, PSLLC will provide written notice of the deficiencies and Pros will have through the next succeeding Panthers game or other scheduled event to correct such deficiencies to PSLLC's satisfaction, though in no event longer than thirty (30) days. If, in PSLLC'S judgment, said deficiencies have not been corrected, this Agreement may be terminated immediately.

2. **Option to Renew**. PSLLC shall have the right to renew this Agreement for three (3) consecutive terms of one (1) year each on the same terms and conditions by giving Pros written notice of intent prior to February 1 of each contract year.

1

3. **Scope of Services**.

      a.    Pros shall provide event staffing for all pre-season, regular season and post-season Panthers football games played at the Stadium during the term of this agreement with the exception of a Super Bowl should the National Football League assume responsibility for event staffing. Pros shall also provide event staffing for other non-NFL events at the request of PSLLC. These services shall include, but not be limited to, hiring, training and supervising ushers, security employees, event coordinators and miscellaneous personnel as required by PSLLC.

      b.    Staffing requirements may vary from game to game or event to event depending on the anticipated attendance. The number of personnel for each game or event will be determined by PSLLC and communicated to Pros at least four (4) days prior to each game or event.

      c.    All Pros' employees will be classified as either Event Staff, Captains or Supervisors. PSLLC will pay to Pros the following hourly rates for employees furnished for stadium events:

### June 1, 2019 through May 31, 2020 rates

| | |
|---|---|
| Event Staff | $21.25 |
| Captains/Supervisors | $26.00 |
| Event Manager | $520/Event |

Overnight staff will be charged at $3 premium per hour to work a third shift.

Holiday rates of 1 ½ times the rates stated above will apply on these days:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Day | Thanksgiving Day |
| Easter | Christmas Eve after 5:00pm |
| Memorial Day | Christmas Day |
| July 4 | New Year's Eve after 5:00pm |

### June 1, 2019 through Option Years

2

All rates will be adjusted to reflect any changes in the Southeast Consumer Price Index Card during the previous year.

The number of hours, not less than four (4), to be worked for each event shall be established by PSLLC not less than four (4) days prior to each event. PSLLC shall be entitled to audit the payroll records of Pros for any event in order to verify the amount being billed and the hourly rate paid to staff, including the time and a half holiday pay.

d.        Pros will provide all equipment necessary for the performance of its duties hereunder including uniforms, two-way radios and other communications equipment, and personnel necessary for stadium control. If requested by PSLLC, some uniforms will be embroidered, at PSLLC's cost, with the Bank of America logo or name. All security personnel provided by Pros will be registered as required by law and will carry or wear appropriate identification. The number and type of radios provided shall be acceptable to PSLLC.

4.        **Payment for Services Rendered**. Pros shall submit to PSLLC invoices for services rendered within seventy-two (72) hours after the game or event or as soon thereafter as is practical. Invoices will be paid by PSLLC within fifteen (15) days of receipt.

5.        **Training**. Pros shall develop written job descriptions and comprehensive training programs for each Pros employee assigned to Stadium events. The training will emphasize customer service, crowd management, security, and all Stadium emergency procedures. Participation in training sessions will be mandatory for each Pros employee. Pros will maintain an information base on its employees to include training records. All Pros training materials will be submitted to PSLLC for approval to ensure that they are consistent with and clearly set forth PSLLC's expectations. The hiring and training programs will be conducted in such a manner that the appearance and demeanor of Pros employees will be totally acceptable to PSLLC. Pros employee handbooks will be written by Pros and submitted to PSLLC for approval. Handbooks will be provided to each Pros employee and shall include policies and procedures for all event staff personnel, including PSLLC's emergency and evacuation procedures. Each Pros employee shall acknowledge in writing that he has read and understands event security plans and emergency procedures. Pros employees' appearance and performance should be such that

3

patrons of the Stadium feel they have been provided superior service by courteous, well-trained employees. All Pros staff must pass a written test, as developed by PSLLC and Pros, prior to being deployed for a Stadium Event.

6.  **Reports**. Within seventy-two (72) hours after each game or event, Pros will furnish to PSLLC a complete report of all activities and incidents relative to staff operations for each game or event. Said reports shall include the names, addresses and other information such as PSL or seat locations of all persons arrested or ejected from the stadium, the names of the arresting or ejecting officers, and all information pertaining to incidents handled by security and/or other event staff personnel. Reports that relate to injuries will also be included and should contain all pertinent information such as name and address of injured party as well as a complete description of the injury, the cause of the injury, and treatment.

7.  **Office Space, Assembly/Storage Room**. PSLLC will provide such office space and assembly/storage areas which, in its sole opinion, are adequate for Pros, free of charge for the term of this agreement.

8.  **Parking**. PSLLC will arrange for parking and shuttle service (if necessary) for Pros employees. Pros will reimburse PSLLC for the reasonable costs related thereto, which will be $6.00 per space per Event.

9   **Indemnification, Insurance and Waiver of Subrogation**.

**Indemnification**. To the fullest extent permitted by law, Pros shall indemnify and hold harmless PSLLC, Panthers Football, LLC, and their respective officers, directors, partners, employees and agents from and against claims, damages, losses and expenses, including but not limited to attorneys' fees arising out of or resulting from performance of services, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of Pros, anyone directly or indirectly employed by Pros, or anyone for whose acts Pros may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

4

**Insurance**. Pros shall obtain and maintain in full force an insurance policy that covers persons and property during the performance of Pros' services at the Stadium. Each policy shall name PSLLC and Panthers Football, LLC as additional insureds. Such policies shall be issued through insurance companies reasonably acceptable to PSLLC and shall not be cancelable without sixty (60) days prior written notice to PSLLC. The provisions of said policies shall protect Pros from claims set forth below which may arise out of Pros operations under this Agreement and for which Pros may be legally liable, whether such operations be by Pros, or anyone for whose acts Pros may be liable:

    a.   Claims under workers' compensation, disability benefit and other similar employee benefits acts.

    b.   Claims for damages because of bodily injury, occupational sickness or disease or death of Pros employees. The Employers' Liability limit shall not be less than $500,000/500,000/500,000.

    c.   Claims for damages because of bodily injury, sickness or disease, or death of any person other than an employee of Pros.

    d.   Claims for damages insured by usual personal injury liability coverage which are sustained (i) by a person as a result of an offense directly or indirectly related to employment of such person by Pros, or (ii) by another person. Personal Injury Liability must include coverage for false arrest, detention or imprisonment, malicious prosecution, libel, slander, defamation of character or violation of right of privacy.

    e.   Claims for damages because of injury to or destruction of tangible property, including loss or use resulting therefrom.

    f.   Claims involving contractual liability insurance applicable to Pros' obligation under this Paragraph 9.

Insurance written to respond to the coverage requirements of parts c. through f. of this paragraph must be written on an occurrence basis policy and shall not be less than $3,000,000 per occurrence. This limit of liability may be written on a single policy or a combination of policies (i.e., primary liability and excess liability).

5

g.  Claims for damages because of bodily injury, death of a person or property damages arising out of ownership, maintenance or use of a motor vehicle. The automobile liability limit shall not be less than $2,000,000 per occurrence.

Certificates of Insurance acceptable to PSLLC shall be filed with PSLLC on or before June 1 each year. In the event that any insurance purchased by Pros as required by this Agreement has a policy renewal date prior to the termination of this Agreement, Pros shall deliver to PSLLC a renewal Certificate of Insurance for the subsequent policy term not less than 14 days prior to the policy expiration date.

**Waiver of Subrogation**. PSLLC and Pros waive all rights of subrogation against each other and any of their employees for any injuries or damages to the extent covered by insurance obtained pursuant to paragraph 9. The policies shall provide such waiver of subrogation by endorsement or otherwise. Specifically, the Worker's Compensation policy must contain a waiver of subrogation endorsement in favor of PSLLC.

10.  **Compliance with Laws and Regulations.** Pros shall at all times comply with all state and federal regulations with regard to their employment practices and their employees. Pros employees will be expected to comply with all state and federal laws and PSLLC policies while providing services to PSLLC. PSLLC reserves the right to remove any Pros employee engaging in any unlawful act or any act prohibited by PSLLC policy from their assignment at the Stadium.

11.  **Independent Contractor Status**. Pros is an independent contractor, and nothing contained herein or in the relationship between Pros and PSLLC shall be deemed to create any partnership or any relationship or employer and employee.

12.  **Non-Assignability**. Pros may not assign this Agreement without the prior written consent of PSLLC.

13.  **Binding Nature of Agreement**. This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6

14. **Governing Law**. This agreement shall be construed in accordance with the laws of the State of North Carolina.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

SHOW PROS ENTERTAINMENT SERVICES
OF CHARLOTTE, INC.

by: _____

Name: _TODD   STEWART_____

Title: _Pres._____


PANTHERS STADIUM, LLC

by: _____

Mark Hart, COO

7