UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-cv-212-MOC

| | |
|---|---|
| SHOW PRO ENTERTAINMENT SERVICES OF CHARLOTTE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>PANTHERS STADIUM, LLC,<br><br>Defendant. | ORDER |

**THIS MATTER** comes before the Court on a motion to dismiss, filed by Defendant Panthers Stadium, LLC, (Doc. No. 7), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**I.  BACKGROUND**

The following allegations by Plaintiff are taken as true and construed in the light most favorable to Plaintiff on the pending motion to dismiss:

Plaintiff provides event staffing and related services for events and facilities in the Southeastern United States, including sports and entertainment facilities and events. (Doc. No. 1-1 p. 5). Defendant controls and operates Bank of America Stadium ("the Stadium"). (Id.).

On June 1, 2010, Plaintiff and Defendant entered into an Agreement to Provide Event Staffing ("the 2010 Agreement"). (Id.). The 2010 Agreement recites Defendant's desire "to provide a first class, pleasurable experience for their fans, which includes every aspect of the operation of the stadium." (Doc. No. 1-1 p. 14). The 2010 Agreement further recites that Plaintiff

1

"represented that it can provide ticket takers, ushers, security personnel and supervisors for Panthers games and other events and that all such personnel will be fully trained and instructed." (Id.). Finally, the 2010 Agreement recites that the "training and supervision by [Plaintiff] of its employees will ensure that the employees perform to the highest standards both in appearance and demeanor." (Id.).

Section 3 of the 2010 Agreement defined the "Scope of Services" in relevant part as follows:

> a. [Plaintiff] shall provide event staffing services for all pre-season, regular season and post-season Panthers football games played at the Stadium during the term of this agreement with the exception of a Super Bowl should the [NFL] assume responsibility for event staffing. [Plaintiff] shall also provide event staffing for other non-NFL events at the request of [Defendant]. These services shall include, but not be limited to, hiring, training and supervising ushers, security employees, event coordinators and miscellaneous personnel as required by [Defendant].
>
> b. Staffing requirements may vary from game to game or event to event depending on the anticipated attendance. The number of personnel for each game or event will be determined by [Defendant] and communicated to [Plaintiff] at least four (4) days prior to each game or event.

(Doc. No. 1-1 p. 15).

In exchange for Plaintiff's provision of these services ("the Services"), Defendant agreed to pay Plaintiff based on rates established in the 2010 Agreement ("the 2010 Rates"). (Id.).

The 2010 Agreement provided for a term of three years from June 1, 2010, to May 31, 2013 ("the 2010 Term"), plus two consecutive one-year options ("the 2010 Option Period"). (Doc. No. 1-1 p. 14). The 2010 Agreement further provided:

> [Defendant] shall have the right to terminate this Agreement <u>if the personnel provided and services rendered</u> by [Plaintiff] are not, in the sole opinion of [Defendant], up to the standards <u>[Plaintiff] and [Defendant] have agreed are necessary</u> and which [Plaintiff] represent[s] [it] can furnish. If [Defendant] elects to terminate under this provision, [Defendant] will provide written notice of the deficiencies and [Plaintiff] will have through the next succeeding Panthers game

2

>or other scheduled event to correct such deficiencies to [Defendant's] satisfaction. If, in [Defendant's] judgment, said deficiencies have not been corrected, this Agreement may be terminated immediately.

(Id.) (emphasis added).

Plaintiff and Defendant operated pursuant to the 2010 Agreement throughout the 2010 Term and the 2010 Option Period. (Doc. No. 1-1 p. 5). Following the expiration of the 2010 Option Period, Plaintiff and Defendant did not execute a new agreement, but continued to operate pursuant to the terms of the 2010 Agreement. (Id.).

In 2017, Plaintiff began an application process for approval as a certified user of Qualified Anti-Terrorism Technology (QATT) by the Department of Homeland Security (DHS) pursuant to the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 ("the SAFETY Act"). (Doc. No. 1-1 p. 6). The SAFETY Act provides certain legal liability protections for claims arising out of acts of terrorism where a QATT is used. (Id.). Crowd management and security services such as those provided by Plaintiff can qualify as a QATT if approved by DHS. (Id.).

Plaintiff began the QATT application process on its own, and not pursuant to any request, recommendation, or requirement on the part of Defendant. (Id.). Plaintiff hired a law firm specialized in regulatory and government affairs ("Plaintiff's Regulatory Counsel") to assist Plaintiff in the application process. (Id.). Plaintiff's Regulatory Counsel has continued working on Plaintiff's certification since 2017. (Id.).

Soon after Plaintiff began the QATT application process, a representative of Plaintiff informed a representative of Defendant that Plaintiff was pursuing QATT approval. (Id.). Due in part to a mass shooting in Las Vegas in 2017, DHS' standards for security service providers to qualify as QATTs increased. (Id.). Plaintiff's Regulatory Counsel has continued to prepare

3

information and materials in support of Plaintiff's QATT application to meet DHS' evolving standards. (Id.).

Following the 2018 NFL season, Defendant asked Plaintiff to prepare a new four-year contract. (Id.). Plaintiff prepared a proposed contract and sent it to Defendant for review and comments on or about June 21, 2019. (Id.). On June 23, 2019, Defendant's Director of Security Stadium Operations, Eddie Levins ("Levins") responded and advised that Defendant required no revisions to the draft agreement and Plaintiff's authorized representative could sign on July 1, 2019. (Id.).

On July 1, 2019, Defendant's President, Todd Stewart ("Stewart"), signed the new Agreement to Provide Event Staffing ("the 2019 Agreement" or "the Contract") and emailed the signed copy to Levins. (Doc. No. 1-1 p. 7). Levins responded on the same date and indicated he would provide Stewart a copy signed by Defendant's Chief Operating Officer, Mark Hart ("Hart"), "asap." (Id.). The 2019 Agreement was identical to the 2010 Agreement except for the term and the rate of pay for the Services ("the 2019 Rates"). The 2019 Agreement says nothing about QATT certification or approval. (Doc. No. 1-1 pp. 22–28).

Defendant never provided Plaintiff a signed copy of the 2019 Agreement; however, the parties operated pursuant to the terms of the 2019 Agreement from July 1, 2019 to July 1, 2020. (Doc. No. p. 8). Notably, Defendant paid Plaintiff pursuant to the 2019 Rates and not the 2010 Rates during this time. (Id.).

By letter dated June 1, 2020 ("the Letter"), Hart informed Plaintiff that Defendant had "concerns" related to Defendant's QATT application. (Doc. No. 9-1 p. 2). Hart advised that Defendant began its own QATT application in 2018 and this required Defendant "to seek out and utilize" QATT technologies and services. (Id.). Hart indicated that Defendant was recently

4

informed that Plaintiff was "no longer seeking certification." (Id.) (emphasis added). Hart took the position that Defendant was not "under any agreement" with Plaintiff because the 2019 Agreement was never "fully executed[.]" (Id.). Nonetheless, Hart indicated Defendant wanted "to give ShowPros the same opportunity to remedy the situation." (Id.). Accordingly, Hart advised: "Unless ShowPros is in [sic] position to verify in the next thirty (30) days that its application for Safety Act certification is in order and will not compromise the Panthers' timeline for its Safety Act application, we plan to terminate our relationship with ShowPros for provision of services at Bank of America Stadium effective thirty (30) days from the date of this letter." (Id.) (emphasis added).

Plaintiff alleges that, at the time Defendant sent the Letter, Defendant had no intentions of permitting Plaintiff an opportunity to confirm the status of its QATT application, or otherwise continuing to abide by the terms of the 2019 Agreement. (Doc. No. 1-1 p. 8). Plaintiff alleges that, by at least early June 2020, Defendant had already reached an agreement with a new provider of event staffing services: WESS Event Services, a GardaWorld Company, a/k/a Whelan Event Services a/k/a BEST Crowd Management ("WESS"). (Id.). As early as June 12, 2020, WESS posted employment applications for event security positions at the Stadium. (Id.). However, from June 2020 and through February 16, 2023, WESS was not QATT-certified for the provision of crowd management or security services such as those provided pursuant to the 2010 Agreement and 2019 Agreement. (Id.).

By letter dated June 16, 2020, Plaintiff's Regulatory Counsel provided confirmation of the status of Plaintiff's QATT application. (Doc. No. 1-1 p. 9). Plaintiff's Regulatory Counsel confirmed that while the process was "arduous and gradual" it was "well into" its efforts in preparing Plaintiff's application and supporting documents. (Id.).

5

On June 18, 2020, Stewart emailed Hart to confirm the letter from Plaintiff's Regulatory Counsel clarified the status of Plaintiff's QATT application and further confirm Plaintiff's commitment to providing the highest level of services at the Stadium. (Id.). Stewart noted that neither he nor Plaintiff's long-time Account Manager for the Stadium, Tim Roberts ("Roberts"), had previously been informed of any concerns related to Plaintiff's provision of services at the Stadium. (Id.). In connection with its repudiation of the 2019 Agreement and replacement of Plaintiff with WESS, Defendant required, or at least encouraged, WESS to hire Roberts away from Plaintiff. (Id.). Roberts was Plaintiff's Account Manager for the Stadium from approximately March 2013 to July 2020. (Id.). In this role, Roberts managed the event staffing team at the Stadium during all events. (Id.). Roberts also served as Plaintiff's primary point of contact for Defendant and became intimately familiar with Defendant's operations and event-staffing needs. (Id.). The experience and knowledge Roberts gained through his employment with Plaintiff provided a substantial benefit to Plaintiff in its provision of services to Defendant. (Id.). On July 2, 2020—one day after the expiration of Defendant's purported thirty-day "cure" period—Roberts resigned from his position with Plaintiff. (Id.).

On July 3, 2020, Stewart informed representatives of Defendant of Roberts' resignation. (Id.). In a response email, Levins wrote: "With the contract ending July 1, we need to discuss the way you can/want to retrieve Show Pro[s] property from the" office at the Stadium. (Id.).

By letter dated July 20, 2020, Plaintiff informed Defendant it was in breach of the 2019 Agreement. (Id.). On March 9, 2023, Plaintiff filed its Complaint in North Carolina state court. (Doc. No. 1-1 p. 4). In the Complaint, Plaintiff specifically alleged: (a) "The 2019 Agreement did not require Plaintiff to seek out or obtain QATT approval in any way"; (b) "The parties did not agree, pursuant to the 2019 Agreement or otherwise, that the Agreed Necessary Standards

6

Case 3:23-cv-00212-MOC-SCR   Document 12   Filed 06/28/23   Page 6 of 10

included QATT approval or any level of achievement in the QATT application process"; (c) "The parties did not agree, pursuant to the 2019 Agreement or otherwise, that the Agreed Necessary Standards required that Plaintiff ensure the status of Plaintiff's QATT application would not compromise any efforts by Defendant to pursue QATT approval"; (d) "The Agreed Necessary Standards apply only to personnel provided and services rendered by [Plaintiff]"; (e) "Obtaining QATT approval is not a service that was, or was to be, rendered by [Plaintiff]"; and (f) "The 2019 Agreement did not condition Defendant's performance in any way on Plaintiff seeking out or obtaining QATT approval." (Doc. No. 1-1 p. 7).

Defendant filed the pending motion to dismiss on May 18, 2023, contending that this action must be dismissed for failure to state a claim. Plaintiff filed a Response on May 31, 2023, and Defendant filed a Reply on June 7, 2023. (Doc. Nos. 10, 11). This matter is ripe for disposition.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the Court must accept as true all of the factual allegations in the Complaint and draw all reasonable inferences in the light most favorable to the plaintiff. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007). However, to survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level," with the complaint having "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555). A complaint may survive a motion to dismiss only if it "states a plausible claim for

relief" that "permit[s] the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." Id. at 679 (citations omitted).

## III. DISCUSSION

Here, Plaintiff brings the sole claim of breach of contract against Defendant. To state a claim for breach of contract, a party must allege (1) the existence of a valid contract and (2) a breach of the terms of the contract. Waddell v. U.S. Bank Nat'l Ass'n, 395 F. Supp. 3d 676, 685 (E.D.N.C. 2019). Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution. Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC, 19cv13580, 2020 WL 1650904, at *4 (N.C. Super. Ct. Mar. 23, 2020). To do so, the Court must first look to the language of the contract and determine if it is clear and unambiguous. Id. If the plain language of a contract is clear, the intent of the parties is inferred from the words of the contract. Id. See also New v. Thermo Fischer Sci., Inc., 1:19cv807, 2022 WL 787954, at *10 (M.D.N.C. Mar. 15, 2022) ("When construing contractual terms, a contract's plain language controls.").

The terms of a contract are to be harmoniously construed. Golden Triangle, 2020 WL 165904, at *4. An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations. Id. If a court finds a contract ambiguous, the intent of the parties becomes a question of fact. Id.

The relevant language in the Agreement provides as follows:

> [Defendant] shall have the right to terminate this Agreement <u>if the personnel provided and services rendered</u> by [Plaintiff] are not, in the sole opinion of [Defendant], up to the standards <u>[Plaintiff] and [Defendant] have agreed are necessary</u> and which [Plaintiff] represent[s] [it] can furnish. If [Defendant] elects to terminate under this provision, [Defendant] will provide written notice of the deficiencies and [Plaintiff] will have through the next succeeding Panthers game or other scheduled event to correct such deficiencies to [Defendant's] satisfaction.

8

> If, in [Defendant's] judgment, said deficiencies have not been corrected, this Agreement may be terminated immediately.

(Id.) (emphasis added). The Court finds that, taking Plaintiff's allegations as true, and construing all inferences in favor of Plaintiff, the Court must deny the motion to dismiss at this time.[1] The parties disagree over the "standards [Plaintiff] and [Defendant] have agreed are necessary." Plaintiff alleges that the parties did not agree that QATT was a necessary "standard" and that the 2019 Agreement did not require Plaintiff to seek out or obtain QATT approval. Defendant disagrees and argues that the language of the letter dated June 1, 2020 ("the Letter") demonstrates that obtaining QATT approval was a requirement to meet the standards the parties had agreed to.[2] As Plaintiff correctly notes, however, this letter is outside of the pleadings and therefore the Court will not consider it on the pending motion to dismiss. In any event, the letter, at most, raises an issue of fact as to interpretation of the parties' contract. "While the interpretation of a written contract may be a question of law that can be resolved in a motion to dismiss where there are no underlying factual issues, if there is any factual dispute regarding how to properly interpret the contract, it is not appropriate for consideration under a 12(b)(6) challenge." DFA Dairy Brands, LLC v. Primus Builders, Inc., 5:21cv26, 2021 WL 5826785, at *3 (W.D.N.C. Dec. 8, 2021). Here, the "standards" the parties agreed to be necessary, or what Plaintiff represented it could furnish, are questions of fact that render dismissal improper. Accord

---

[1] To extent that Defendant makes various references to facts that are not supported by any document or that are not part of Plaintiff's pleadings, the Court does not consider them on this Rule 12(b)(6) motion to dismiss.

[2] The letter specifically states that Defendant "ha[s] repeatedly made clear that Safety Act certification is a requirement to meet the standards the Panthers seek for the provision of services since prior to any contractual negotiations" and that "without Show Pros' receipt and maintenance of Safety Act certification, the Panthers' own current application is in jeopardy." (Doc. No. 9-1: Letter dated June 1, 2020).

Ospina v. Griesinger Assocs., Inc., 3:30cv89, 2021 WL 510627, at *5 (W.D.N.C. Feb. 11, 2021) (holding dismissal was unproper where there were "contests surrounding the facts regarding what precisely the engagement letter foresaw as Defendants' obligations under the contract.").

### IV. CONCLUSION

For the reasons stated herein, the Court denies Defendant's motion to dismiss.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Dismiss, (Doc. No. 7), is **DENIED**.

Signed: June 27, 2023

Max O. Cogburn Jr
United States District Judge